We'll hear the next case. Bertuglia v. Port Authority May it please the Court, John Nornsberg on behalf of Robert Bertuglia Jr. and Laro. Your Honors, this was a criminal prosecution that should never have been brought. What happened here was a breach of contract between two sophisticated commercial entities, not grand larceny. And whatever issues there were with respect to Laro's performance under this contract should have been litigated in a civil arena, not in the criminal court system in New York. Now if we step back on a de novo review and look at this evidence in a fresh light on this record, there is absolutely no evidence of any theft or fraud or intent to defraud. And in fact, the grand larceny charges fail as a matter of law on two specific grounds. One, there is no intent here in the record anywhere, no criminal intent. Two, there's no reliance. The DA's office conducted an investigation, interviewed witnesses, and made a decision to charge your clients, right? Yes, but as this Court has pointed out in Cameron v. City of New York, what a DA's office does subsequently has no impact on whether or not an officer has committed a malicious prosecution. And I just want to quote it exactly for the record. Generally, quote, generally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial potentially tortious behavior. I think that's the key issue. I mean, even if we assume, and I will tell you I'm inclined to assume the veracity of your initial hypothesis, which is, in fact, this is a criminal prosecution that should not have been brought, that doesn't get you there. What you've got to establish is that, in fact, material false information was a motivating factor to the prosecutor in bringing the prosecution. And that's where I think you've got the hardest time. Okay, but we would agree, just as a general proposition, we start with the idea that causation is generally an issue of fact for the jury. A reasonable jury can find. Right. Now, this court in Rentis v. Ruffin this spring addressed almost an identical issue, which is whether or not a court properly granted summary judgment on malicious prosecution on the ground that the DA conducted a so-called independent investigation. The district court said, yes, this was independent and threw out the malicious prosecution claim. This court reversed and said there were issues of fact that, on the record, it wasn't clear whether or not this was truly an independent investigation or whether or not it was tainted by some false information. And here, we have powerful evidence in the record that ADA Russo was not acting independently. We have evidence in the record, for example, that ADA Russo followed a suggestion by Mr. Schaffler to investigate Mr. Bertuglia's elderly parents. She admitted at her deposition she said she was reluctant to do it. She said it wasn't fair play and it was outside her comfort zone. Schaffler recommended it. She followed it. A reasonable jury could make the same conclusion. But it was still her choice. She made that decision. She might have been uncomfortable, but she made the decision. What was false about that? He gave his opinion to her that you should do this, and she was reluctant, but she did it. Well, the difference is this is unlike a typical 1983 case where there's a handoff between the police officer, they hand off the case to the DA's office, and they run with it. Here, the defendant, Schaffler, stayed actively involved for two and a half years in this investigation. And like Judge Rakoff found in the Tobai case, which we cite in the brief, that the Inspector General's office in that case was sufficiently involved over a long period of time that a reasonable jury could conclude that there was, in fact, causation. And we must also posit, Your Honors, that causation, there doesn't have to be a sole proximate cause. It could be more than one proximate cause, as this court said in Hydroelectric v. Trafalgar. What is the false information that Schaffler gave the DA's office? First, he invented a false conversation that directly placed Mr. Petuglia with knowledge of the missing two pieces of equipment. He said to ADA Ruzzo that there was a conversation between Laro's on-site manager, Mr. Kolakowski, and Mr. Petuglia, in which they discussed the two missing pieces of equipment. Wouldn't Ruzzo go interview Kolakowski and put him in the grand jury? Wouldn't she see for herself whether, in fact, Kolakowski said those things? How is the suggestion from Schaffler material in that sense? Because it's a fact that motivates, that moves the prosecution forward from the realm of a simple breach of contract into knowing falses. Presumably, when she did her investigation, she found some things that caused her to want to continue. But, Your Honor, to answer the question, this is a separate part of Cameron. Again, I think it's critical. It says, Appellee's theory, making the same argument the court just posited. Appellee's theory misunderstands the function of a screening prosecutor in relation to a malicious prosecution claim. The prosecution's actions do not supersede the complaining officer's actions. They only determine whether the officer's actions come to fruition. That is, whether the officers committed the tort of malicious prosecution or merely attempted to prosecute maliciously. And let me point out, Your Honors, we've dealt only with malicious prosecution. This court is very clear. Assume I'm wrong, the court disagrees with me that this is an independent decision. Despite all the evidence that we corralled also in the conspiracy section, we put all the evidence together of how they were working together over two years. But assume the court disagrees. That would not be a defense to the fair trial claim. The fair trial claim probable cause wouldn't be a defense. And as this court said again in Rentis v. Ruffin, that whatever independent, untainted probable cause exists, it would not defeat a fair trial claim. The fair trial claim would go forward. The judge threw out the fair trial claim on grounds that don't stand up. For example, the judge found that the shaffler never testified. Therefore, there couldn't be a fair trial claim. Multiple district courts have rejected that proposition. One of them is Garnett, which today, this actual today, this court affirmed on appeal. In Garnett, it said, the court said, you do not have to testify. The nature of the tort of a fair trial claim exists and arises the moment the false information is transmitted. It still has to be material, right? It still has to cause the prosecutor to go forward with the case. But who makes that decision, the judge or the jury? The question on this record, two and a half years of involvement, where, and remember, this is coming from the Inspector General's office, the in-house police department of the Port Authority. This man's walking over to the DA and saying, these guys stole a lot of money from us. This court has recognized in the past the aura of reliability that comes from a state official making representations. In fact, $150,000 was paid for equipment that was never purchased, right? But the critical point is that this is- I understand that, but it's not as if it was a crazy theory because- No, but the difference- Then it becomes the question of intent. But as a factual matter, there was an overbilling, right? We have to be clear. The overbilling is the difference in the value of services between using new equipment versus the value of services using the older equipment. The Port Authority did not own this equipment. It was not a sale of equipment. At the end of the contract, the equipment goes back- The Port Authority was paying for new equipment that it never got. They were paying for services which they said were, quote, very good, end quote, and very impressive. So good, Your Honor, that they actually renewed the contract after three years, even after they learned about the breach. So they couldn't be reliant. Even if the new equipment wouldn't have meant better services, they paid extra based on new equipment. That's really, I would respectfully disagree. It's a lump sum contract. There's no line item in any invoice talking about equipment. They were getting paid roughly $600,000 a year, a month. It's a $26 million contract. These are two pieces of equipment out of 14, out of 16, that were not purchased. But they were paying for cleaning services. That's, at the end of the day, the critical point. If there is a problem here, the problem is a breach of contract. What takes it- Do you have some time left for rebuttal? Okay. Unless you want to take it now. No, I'll take it. Thank you. We'll hear from the other side. May it please the Court. My name is Kathleen Miller. I'm an attorney with the Port Authority Law Department. There are only three claims that have been appealed in this case. And those three claims are against my client, Jeffrey Schaffler. One is the malicious prosecution. The second is the fair trial. And the third is the conspiracy claim. Judge Kodal, in a very exhaustive decision, found multiple grounds to dismiss the malicious prosecution claim. And the first of these is that there were two grand jury indictments. And the law of New York, as the Court of Appeals of the State of New York found in Colan v. The City of New York, is that a grand jury indictment creates a presumption of probable cause, which I'm sure this Court knows very well, because they adopt this standard in Rothstein v. Carriere. And that presumption can only be rebutted if you show that there was fraud, perjury, suppression of evidence, or some other bad conduct on the part of the police officer, or in this case, the investigator. So the state court judge who dismissed the indictment the second time talked about prosecutorial misconduct that, in its view, came very close to the line. And also we have some allegations with regard to Mr. Schaffler's alleged misconduct in reporting falsely, again, allegedly this conversation between Kolakowski and Bertuglia, calling Mr. Bertuglia a crook that stole a lot of money and so on. Are those factors not enough, at least to raise a question, about whether the presumptions overcome in this case? I think not, Your Honor. In the first place, the conduct that Judge Weibel referred to in his decision by the prosecutors, he clearly stated, did not rise to the level of misconduct such as would support vacating the grand jury indictment. His decision reflected a struggle about that, and the district court judge here wrote an excellent opinion, but said, I believe, that he was discounting or ignoring those statements because it was hearsay, although the record reflects the prosecutor's activities in vouching for witnesses and other conduct that the state court judge called out. So I'm a little concerned that Judge Kotal may not have taken full account of the behavior. Well, I do agree with Judge Kotal that it is hearsay. We did argue that in our briefing. But it is reflected in the record, correct? It is reflected in the record. The record's not hearsay. The court's entitled to look at what activity was pursued in the record. That's true. But Judge Weibel was very clear that the prosecutorial errors did not rise to the level of misconduct such as that he would set aside the decision. His decision to set aside the first grand jury indictment, and it was only set aside against Bertuglia, it was not set aside against Larro, and the second grand jury indictment, which was set aside against both Larro and Bertuglia. He talks about errors, and he talks about vouching. He talks about the prior bad acts related to the health care. But he distinctly says this does not rise to the level of misconduct such as he would set aside the verdict. But it was clearly serious. He said the court further feels the need to comment on the prosecutor's misconduct in their presentation to the grand jury. The presentation does not rise to the level, but it is very close. Very close, but does not rise to the level. Even putting aside the prosecutor's misconduct, this guy, Shantler, I mean, what kind of nuts here, right? I mean, he took this as a personal thing to get this company for minor misconduct. If the due process clause doesn't prevent this, then really, what protection does a company have? Well, there are decisions to say we don't go behind the motive if there is sufficient evidence to support the investigation. He's the thorough investigator, and there's been no showing here. What is thorough? Exhaustive, perhaps, Your Honor, would be a better word. He's an exhaustive investigator. He looked at everything that the court. Exhaustive? It's alleged that he fabricated a statement that would have ascribed direct knowledge to Mr. Bertuglia about the absence of the two pieces of equipment. That statement, there are three things, three little things, that the plaintiff has said that Shantler did. One is Shantler stated that he found that Lara was overbilling the Port Authority, which is factually true. Intentionally overbilling. Intentionally overbilling. That's the debatable part. There is some evidence to support that. If I have an opportunity, I'd like to go into that, and that's Larry Waxman's testimony, that Mr. Bertuglia was present at meetings with the Port Authority. That's in the second grand jury proceeding. When they discussed how the costs were being allocated and that the equipment was part of what they were paying for when they were paying the cost and that the Port Authority was paying $154,000 over the three-year period for equipment that Lara never bought. The second piece of evidence that plaintiffs rely on is that this is allegedly that Shantler told the ADA Rousseau that Kolakowski spoke to Bertuglia about the equipment. Kolakowski never testified before the first grand jury. Kolakowski testified before the second grand jury, and we're looking at what the grand jury had before, when, and indicted because we are saying that that's the probable cause. Kolakowski never said that he spoke to Bertuglia to the second grand jury. What he said to the second grand jury was that Bertuglia was a hands-on person, that he was involved in every aspect of the case and made major decisions for the company. That's what he told the second grand jury. Shantler never testified to the first grand jury or the second grand jury, so that piece of information never got to the grand jury, wasn't part of their decision to indict. And the evidence is that ADA Rousseau interviewed Kolakowski before the grand jury proceeding, so she had ample opportunity to find out whether Bertuglia or not. The third piece of evidence, upon which plaintiff relies, that they say was the false evidence created by Shantler, was Shantler's statement to Bertuglia that he was a crook and a thief. The only evidence in the record that Shantler made that statement is Bertuglia's testimony that at his meeting with ADA Rousseau when he was represented by his attorney, Shantler said to him, We have to assume that's true, though. Assuming that's true, he had a lawyer present to rebut it. There's no evidence that that statement, that opinion by Shantler, had any influence on ADA Rousseau, who did her own investigation, and testified she did her own investigation for more than a year. Why isn't the fact that he said it to her some evidence that it influenced her? The mere fact that he said it as a matter of opinion is no evidence that it influenced her. She did a vast investigation here. She issued 35 subpoenas. It influenced her to the extent that it encouraged her to continue with the investigation. She never said that, Your Honor. Looking at the facts most favorable to the plaintiff, he is driving at her incessantly for two years. He's going after her. Get this guy. He's got a vendetta. He's not letting up on her, and he's persistent. Could not a reasonable jury conclude that he got to her? There's no evidence that he got to her. She never said that he got to her. Remember, Your Honor, Mr. Bertuglia came up on the ADA's radar screen long before Jeffrey Schaffler appeared on the scene. He was part of a wiretap of somebody called Grimaldi, whom they were investigating, who ultimately was convicted of some form of influence peddling. Did the jury also infer that the reason they decided to go after Mr. Bertuglia is because he wouldn't cooperate against Mr. Grimaldi, and so it was part of the vendetta? You're talking about the ADA. The ADA is not part of this appeal. That's Schaffler. Schaffler did not do the wiretap. It was the ADA's investigation into Grimaldi and Gargano that brought their attention to focus on Bertuglia because in that wiretap, Bertuglia is discussing his Port Authority contracts. He's talking about his person at the Port Authority, who nobody knew, and that's what Schaffler began to investigate. Who did he have at the Port Authority? Was there some overbilling in the contracts? That was the initial investigation. It grew out of the wiretaps that the ADA shared with Schaffler, and then Schaffler began to explore other aspects, including the fact that Laro had put Mr. Bertuglia's ex-wife and his mother, who were not employees of the company, onto the health care plan, and they were looking into potential health care fraud. They didn't indict him for that. They didn't prosecute him for that, but it was an investigation, and I know of no case that says you have a constitutional right not to be if there are some facts that would support that investigation. The only indictment here, the only prosecution, was with respect to the overbilling of the Port Authority, and there's ample proof to support that. They billed 36 times over the course of the two years. They were paid on those bills. Those bills contained a component of $0.76. Mr. Vedder testified. In the context of this contract, to draw an intentional fraud out of it? It may have been a breach of contract, but it was also a fraud where they billed $154,000 for equipment that they never purchased. It was to provide services using new equipment, and the $0.76 component, I believe, was incorporated into the overall bill. It's not like there was a line item that was blatantly false. Isn't that correct? Well, as part of the contract, after they submitted their initial proposal, which incidentally Vedder said was reviewed by Bertuglia, the Port Authority came back to them and asked them to give a breakdown of the dollar amounts that they were going to be charging, and in that breakdown it clearly says that $0.76 is for equipment, and Mr. Bertuglia admitted at his deposition that he partially understood that it was for equipment. I'm asking, on the individual bills, was there a line item that said X is for? No. Your Honor is correct. On the individual bills, there was no line item. It was just a monthly bill for services to the tune of over a year, over $600,000. It was a $24 million contract, and while this may have been a small part of the contract, it was nonetheless significant that two pieces of equipment, both of which exceeded $50,000, were not purchased. Which may make a good breach of contract claim, but it's a little hard to get to an intentional fraud, isn't it? Well, I think Vedder testified that Bertuglia knew very well that he had to buy the equipment. Vedder left early on, though, didn't he? I'm sorry? Didn't Vedder depart? He did depart in 2005, but he testified that in 2003 there was a meeting with the Port Authority because they were cutting back on the hours for loan, and that they talked about the issue of how this impacted them adversely because they had fixed costs in their hourly rate. So cutting back on hours would adversely impact them, and they talked about it. And this is what he testified to in the second grand jury proceeding, that Bertuglia knew that the equipment was part of the fixed costs for which he was billing on an hourly basis, and he knew because it was in the prior contract. The 96th contract also required the purchase of new equipment. Thank you. We'll hear the rebuttal. Thank you. Your Honors, a few points to clarify right at the outset. My adversary conflates knowledge with intent. The Court of Appeals and People v. Bailey, which we cited in the reply brief, made it clear these are two separate elements. Even if one could presume a generalized knowledge of whatever requirements there were in the contract, that's entirely separate from fraudulent intent. And now, having heard my adversary argue, we still have not heard any evidence that supports that. I want to also clarify that my adversary said that when Ms. Schaffler first, he got the wiretaps, and then he continued this investigation. Not true. The record is quite the opposite. He went in May of 2007. He admitted at his deposition he had no evidence whatsoever at that time of overbilling. He did not receive the wiretaps until late fall, six or seven months later at the end of the year. He did not have those wiretaps. He brought this investigation to the DA's office and retroactively is trying to use the wiretaps as a justification. With respect to the grand jury, why do you think he was doing this? What was his motive? He had bigger fish to fry. He was trying to get Charles Gargano, who was the vice chairman of the Port Authority, he thought my guy had information. If he squeezed my guy enough, he could get the information. We know that not from speculation, from the record. He put in an email to his supervisor. He said Bertuglio is, quote, a worthy and vulnerable target, end quote. If, quote, pressured enough, end quote, he can, quote, lead us to other areas, end quote. So this is in the record. He had a motive to do it. Bertuglio was easy to roll on for this breach of contract, pressure him to spill the beans of what he thought he knew about Gargano. Just going back to Judge Carney's point with respect to the prosecutorial misconduct, counsel quoted from one part, referred to one part of the decision, but, Judge, you're correct, in another part of the decision, the court said, quote, the court believes it rendered the presentation so defective that the indictment must be dismissed on this ground as well. And that's at 411 in the record. And one might reasonably question at the outset why an indictment that was dismissed on two separate occasions for lack of legal sufficiency, why that indictment would give rise to any presumption. One court has found that it shouldn't. That's the Cox case, which we cite, which we think has compelling reasoning. If you can't make out a prima facie case, even viewing the evidence most favorably to the people at the stage of a grand jury, then why should that dismissed indictment turn around and create a presumption of probable cause? But assuming it does, there's a brand-new court of appeals case that came out after Judge Kotal made his decision. He didn't have the benefit of this. But it's a very important case. Thirty years have passed until the court of appeals spoke again on what does it take to overcome the presumption. And the court expanded and broadened the grand jury presumption and laid out two standards that are very important. And I just want to quote it, put it on the record, if we could. One way of overcoming the presumption, according to Delors-Torres, this is the new case, is the plaintiff shows, quote, the evidence of guilt relied upon by the defendant was so scant that the prosecution was entirely baseless and maliciously instituted. Here, it was so scant. The criminal court judge threw it out twice. He called it weak. He said it didn't belong in the criminal hemisphere. The other standard, the other way of overcoming the presumption. Why don't you finish up? The defendant falsified evidence in bad faith, and without that falsified evidence, the authority, suspicion of plaintiff would not have fully ripened into probable cause. That fabricated statement regarding Kolakowski fits this to a T. We respectfully submit there's enough in the record to overcome that grand jury presumption and send this case to a jury. Thank you so much. Just one clarification. At this point, as far as I can tell from your briefs, you're only proceeding against Shaftler? That's correct, Your Honor. Okay, thank you. We'll reserve decision.